BRACEWELL LLP
Robert G. Burns
Mark Dendinger
Joshua D. Neifeld
1251 Avenue of the Americas, 49th Floor
New York, New York 10020
Telephone: (212) 508-6100
Facsimile: (212) 508-6101

*Proposed Counsel for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>Seabras 1 USA, LLC *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 19-[\_\_\_\_] (\_\_\_)<br><br>(Joint Administration Pending) |

**DECLARATION OF ROGER KUEBEL IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Roger Kuebel, make this declaration under 28 U.S.C. § 1746.

1.     I am the Chief Financial Officer of Seaborn Management, Inc. (d/b/a Seaborn Networks), a submarine cable company headquartered in Beverly, Massachusetts ("**Seaborn Manager**"). I am also Chief Financial Officer for the above-captioned Debtors (the "**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"). In these capacities, I am responsible for managing all financial operations of Seaborn Manager and the Debtors, as well as treasury and tax. I have served in this role since February 3, 2014.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective tax identification numbers, are Seabras 1 USA, LLC (0027) and Seabras 1 Bermuda Ltd. (7149). The Debtors' principal offices are located at 600 Cummings Center, Suite 268Z, Beverly, MA 01915.

2.      I have an M.B.A. from the University of Chicago, with a specialization in finance, and a B.S. from the Pennsylvania State University, majoring in Operations Management.

3.      In my capacity as Chief Financial Officer of Seaborn Manager and the Debtors, I am generally familiar with Seaborn Manager's and the Debtors' day-to-day operations, business and financial affairs, and books and records. I am above 18 years of age, and I am competent to testify.

4.      I have almost 20 years of experience working in the wholesale carrier industry. I began my career in manufacturing at a division of General Motors and spent four years after graduate school at the consulting firm of Stern, Stewart & Co. Prior to joining Seaborn Manager and the Debtors, I served as Vice President and Treasurer for public telecom and technology companies, including senior finance positions at Global Crossing, Genuity, GTE Corporation, and, most recently, Aspen Technology, Inc.

5.      Throughout my career I have led, or played a key role, in equity and debt IPOs, as well as chapter 11 restructurings, and have extensive experience in all aspects of financing with respect to both bank and capital markets. Additionally, I have significant experience in operations analysis, financial planning, tax planning, transfer pricing, insurance, management of receivables and payables, mergers and acquisitions, financial systems and processes, and reporting, both internally and externally.

6.      On the date hereof (the "**Petition Date**"), I submit this declaration (this "**Declaration**") to assist this Court and parties-in-interest in understanding: (a) the Debtors, their operations, and their capital structure; (b) the circumstances related to the commencement of these chapter 11 cases under Title 11 of the United States Code (the "**Bankruptcy Code**"); and (c) the

relief requested by the Debtors pursuant to the pleadings described herein (collectively, the "**First Day Motions**").

7.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

8.      This Declaration is organized in three sections.

- Section I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of these chapter 11 cases.

- Section II sets forth relevant facts in support of the First Day Motions.

- Section III provides information required by Local Rule 1007-2.

## I.      BACKGROUND

### A.      The Debtors' Business

9.      Debtors Seabras 1 USA, LLC, a Delaware limited liability company ("**Seabras USA**") and Seabras 1 Bermuda Ltd., a Bermudian company ("**Seabras Bermuda**") comprise, together with their non-Debtor subsidiaries, the Company. The Company is the owner of a submarine fiber optic cable system.

10.     Specifically, the Company's primary asset is a 10,800 km subsea telecommunications cable system connecting the U.S. with Brazil known as Seabras-1 (including the terrestrial routes and assets referred to below, "**Seabras-1**"). Seabras-1 was completed and brought into service on or about August 2, 2017, which is referred to as the ready-for-service date

-3-

("**RFS Date**") and connects points of presence ("**POPs**") in New York with POPs in Sao Paulo, Brazil. Its expected life is estimated to be 25 years from the RFS Date. Seabras-1 includes the subsea network from Avon-by-the-Sea, New Jersey to Praia Grande, Brazil as well as certain terrestrial fiber routes extending into data centers located in New York City and Sao Paulo, Brazil. Additionally, the Company owns an indefeasible right of use ("**IRU**") for half of a fiber pair on AMX-1. IRUs are long-term contracts with large fees typically paid up front at the beginning of the contract term.



Map showing Seabras-1 and AMX-1.

11.    Although Seabras-1 is the primary asset of the Company, title to the subsea network from Avon-by-the-Sea, New Jersey to Praia Grande, Brazil is not yet owned by the Company. Title to that subsea network remains owned by Alcatel Submarine Networks ("**Alcatel**"), the party that built the subsea network for the Company under a turnkey installation contract (the "**EPC**

Contract"). Pursuant to the EPC Contract, Alcatel has provided the Company with a consent to use the subsea network, pending payment in full of the amounts owed under the EPC Contract. The remaining amount to be paid under the EPC Contract by the Company to Alcatel is approximately $7 million, but that amount is not yet due or payable pursuant to the terms thereof and has not been invoiced by Alcatel to the Company.

12.     Seabras-1 operates as a six-fiber pair system with an initial maximum design capacity of 72 terabits per second (Tbps). Cable landings for Seabras-1 are established in Wall Township, NJ and Praia Grande, Brazil, and the system includes branching units for future branches to be potentially installed to or near Virginia Beach (USA), Miami (USA), St. Croix (USVI), Fortaleza (Brazil), Recife (Brazil), Rio de Janeiro (Brazil) and Porto Alegre (Brazil), but no such branches exist at this time nor are there customer contracts or other sources of funds in existence to enable the build of any such branch yet. Through Seabras-1, Debtor Seabras USA sells international broadband capacity between the United States and Brazil, as well as other related services, to its customers. In connection with its operations, two of Seabras USA's critical POP locations for Seabras-1 are located in data centers in New York City, located at 60 Hudson Street and 111 8th Avenue, respectively (the "**Data Centers**"). Debtor Seabras USA also leases fiber routes in New York City, as shown in the map below, that are an integral part of the Seabras-1 system. In addition, Debtor Seabras Bermuda has certain bank accounts located in New York City.



Map showing the fiber routes (blue lines) within Manhattan connecting to Seabras-1 through New Jersey

13.     The Company derives its revenues from the sale and leasing of capacity on Seabras-1 to telecommunications companies, internet service providers, content/cloud service providers, financial institutions and large enterprises. The majority of the Company's revenue since the RFS Date of Seabras-1 is generated from the lease of capacity for terms of one or two years, with payments made monthly during the term.

### B.     Corporate Structure and Operations

14.     Non-Debtor Seabras Group, LLC ("**Seabras SPV**"), a Delaware limited liability company, owns 100% of the membership interests in Debtor Seabras Bermuda. Seabras Bermuda was formed to serve as the Company's primary borrower under the A&R Facilities Agreement (defined below) and in connection therewith, maintains certain bank accounts located in the United

States. Debtor Seabras Bermuda has no significant operating activities, but directly owns 100% of the membership interests in Debtor Seabras USA. Besides its ownership interest in Seabras USA, Seabras Bermuda has over $40 million in cash in New York bank accounts, of which approximately $31 million is held in restricted accounts related to the A&R Facilities Agreement. In addition, Seabras Bermuda owns a small interest in subsidiary non-Debtor (described below).

15.     Debtor Seabras USA owns all Seabras-1 network assets located outside of Brazil (subject, as noted above, to Alcatel's ownership under the EPC Contract), leases usage of POPs located in certain data centers in the United States, holds relevant U.S. licenses and permits, and generates revenue by selling capacity on Seabras-1. Seabras USA also owns the IRU for half of a fiber pair on AMX-1 between Jacksonville, Florida and Rio de Janeiro, Brazil (referenced above), but has not lit any capacity yet on this system and does not yet generate any revenue on that system. Moreover, Seabras USA is the ultimate majority owner of two non-Debtor Brazilian companies: (i) Seabras 1 Holdings Brasil Ltda. ("**Seabras Brazil Holdco**"); and (ii) Seabras 1 Brasil Ltda. ("**Seabras Brazil OpCo**," and collectively with Seabras Brazil Holdco, the "**Brazilian Subsidiaries**"). Seabras Bermuda owns the portion of Seabras Brazil Holdco not held by Seabras USA. With respect to the Brazilian Subsidiaries, Seabras Brazil Holdco's sole purpose is to hold the shares of Seabras Brazil OpCo. Seabras Brazil OpCo generally functions to own the Brazilian Seabras-1 assets, hold the Brazilian licenses and permits with respect thereto, and generate revenue by selling capacity on the Brazilian territorial portion of Seabras-1.

16.     An organizational chart illustrating the Company's corporate structure is attached hereto as **Exhibit A**.

### C.    Management Services Agreement

17.    Although the Debtors own the assets described above and are the parties to customer contracts and certain vendor contracts, neither of the Debtors are true operating companies. The Company has no employees, has no computer systems for sales, finance or network management, has no software licenses, and has no network operations centers. All commercial operations for the Company, including all operations & engineering, sales, and general & administrative functions, are provided on an outsourced basis by Seaborn Manager. Seaborn Manager performs all of the Company's business and commercial functions and pays all operational costs and expenses of the Company (certain categories of which Seaborn Manager causes the Company to pay directly and other categories of which are paid directly by Seaborn Manager and reimbursed by the Company). An affiliate of Seaborn Manager is one of the equity owners of Seabras SPV.

18.    Seaborn Manager provides services to the Company pursuant to that certain Management Services Agreement originally by and between Seaborn Manager and Seabras SPV, dated December 18, 2015 (as amended and/or novated, the "**MSA**"), which was novated on November 19, 2019 to Debtor Seabras Bermuda pursuant to that certain Management Services Agreement Novation Agreement (the "**Novation**").

19.    Pursuant to the MSA, Seaborn Manager, which is operated by certain directors and officers of the Debtors,[2] is obligated to provide services covering substantially all of the operations of the Company (collectively, the "**Managed Entities**"). Those services include, among others:

- Company Operations – cause the carrying out of all of the operations of the Managed Entities. This includes:

---

[2] Specifically, Larry Schwartz, Chief Executive Officer of the Debtors, Andy Bax, Chief Operating Officer of the Debtors, and I, Chief Financial Officer of the Debtors, are also officers of Seaborn Manager. Larry Schwartz, Andy Bax and I are also the sole members of the board of directors of Seaborn Manager.

- o (i) designing, planning, and managing substantially all work relating to or arising from Seabras-1 and related network infrastructure; and

- o (ii) performing all of the Managed Entities' operations, sales and general and administrative management functions, including accounting, tax, reporting functions (financial, environmental or otherwise), accounts receivable, accounts payable, insurance, invoicing, payroll, cash management, maintenance of books and records, regulatory compliance, contracts negotiation and contracts management, property management, direct and indirect sales, channel strategies, pricing, corporate marketing and product marketing, human resources and information technology functions.

- Oversee Reorganization Activities – oversee any reorganization, bankruptcy proceedings, dissolution or winding up of any of the Managed Entities.

- Payment of Taxes – manage the calculation and payment of taxes payable, and the preparation and filing of all tax returns by the Managed Entities.

- Manage Bank Accounts - attend to the opening, closing, operation and management of all the Managed Entities' bank accounts and the Managed Entities' other accounts held with other financial institutions, including making any deposits and withdrawals reasonably necessary for the management of the Managed Entities' day-to-day operations.

- Insurance Coverage - arrange for and manage commercially reasonable insurance coverage relating to the Managed Entities and their property and assets.

20.    Additionally, Seaborn Manager performs services in connection with, *inter alia*, financial planning, contract negotiations and execution, pre-installation and installation activities, system/branch design, build management, commissioning and acceptance, sales support, and marine reports. In short, the Company does not operate or function as a business, and Seabras-1 does not operate or function as a telecommunications network, without the roles and responsibilities provided by Seaborn Manager under the MSA.

21.    In exchange for its services under the MSA, Debtor Seabras Bermuda is obligated to pay a management fee as detailed in the MSA.

### D.    Revenue and Assets

22.    For the fiscal years ending December 31, 2017 and 2018, the Company's revenue was $2.2 million, and $12.9 million, respectively. For fiscal year 2019, the Company had revenue of $11.9 million for the nine months ending September 30, 2019.

23.    As of September 30, 2019, the GAAP book value of the assets of the Company were approximately $432 million on account of:(i) $71 million in current assets comprised of trade and other receivables and cash and cash equivalents (including $31 million of restricted cash); (ii) $302 million in fixed assets comprised of: (a) property, plant, and equipment, (b) construction work-in-progress, (c) leasehold improvements, and (d) capital leases; and (iii) $59 million of investments in subsidiaries.

### E.    The Debtors' Prepetition Capital Structure

*A&R Facilities Agreement*

24.    As of the Petition Date, the Debtors had outstanding debt in the aggregate principal amount of approximately $149,194,360 (the "**Prepetition Secured Debt**"). The Prepetition Secured Debt was incurred pursuant to two facilities under that certain Amended and Restated Facility Agreement, dated September 15, 2015, by and between, among others, Debtor Seabras Bermuda, as Borrower, Debtor Seabras USA and the Brazilian Subsidiaries, as Guarantors, and Natixis as, among other things, agent for the Lender parties thereto (the "**A&R Facilities Agreement**").

25.    Substantially all of the Debtors' assets are encumbered to secure the Prepetition Secured Debt pursuant to that certain Offshore Security Agreement, dated September 15, 2015 (the "**Offshore Security Agreement**") and related security documents. Further, Seabras SPV and

Debtor Seabras Bermuda have provided share pledges in favor of Natixis, as Offshore Collateral Agent, pursuant to that certain Offshore Share Pledge Agreement, dated as of September 15, 2015.

*General Unsecured Obligations*

26.     With respect to general unsecured obligations, Debtor Seabras Bermuda's sole obligation concerns payments due pursuant to the MSA. Debtor Seabras USA's obligations concern payments due in connection with services provided by various third party vendors. As of the Petition Date, to the best of my knowledge Seabras Bermuda is current on all of its payments pursuant to the MSA.  Debtor Seabras USA is current with respect to all of its payments except as detailed in its voluntary chapter 11 petition.

### F.     Circumstances Leading to These Chapter 11 Cases

27.     These chapter 11 cases have been filed, in part, because significant changes in the subsea telecommunications industry have jeopardized the Debtors' ability to meet their obligations under the A&R Facility.

28.     In this respect, as mentioned above, IRUs are long-term contracts with large fees typically paid up front at the beginning of the contract term. IRUs contrast with leases, which tend to be one or two years in length and have payments made monthly over the contract term. During the underwriting stage for Seabras-1, it was assumed that most of the project's revenue would be generated from IRUs, not leases. Indeed, the A&R Facility's amortization schedule and maturity date was designed to capture much of the expected large cash payments associated with IRUs that were anticipated to be received by Debtor Seabras Bermuda and its subsidiaries following the RFS date.

29.     Immediately following the closing of the financing for Seabras-1, however, the market landscape changed. First, a competing larger and newer underwater cable project

-11-

commenced its build, which system had not been anticipated by the Company, its lenders, direct and indirect shareholders, or their respective market consultants. Second, and compounding problems, during the build of Seabras-1, the Brazilian economy collapsed and the so-called "Car Wash" corruption scandal engulfed many of Brazil's business and political leaders. The foregoing resulted in severe price drops on the Seabras-1 U.S.-Brazil route, far lower than any of the Company's lenders, borrowers, direct and indirect shareholders and market consultants had previously expected.

30.    As a result of the foregoing, market participant behavior changed significantly. Instead of larger purchases of IRUs with front-end payments of large cash amounts at high price points, customers quickly shifted to purchasing small amounts of capacity for one-to-two year terms as leases, which are paid monthly. For the Company, the consequence of this changed market meant that the original amortization schedule and maturity date contemplated by the A&R Facilities Agreement no longer reflected the reality of the Company's business or industry.

31.    In light of these challenges, Debtor Seabras Bermuda failed to meet its debt service coverage ratio requirements for the relevant period ending September 30, 2019 pursuant to the A&R Facilities Agreement (the "**DSCR Breach**"). As a result, there is an on-going event of default under the A&R Facilities Agreement. Further, based on the Company's current financial projections, it does not expect to have sufficient liquidity to meet relevant debt service coverage ratio requirements pursuant to the A&R Facility going forward, nor does it expect to be able to make an upcoming $11 million principal and interest payment under the A&R Facilities Agreement due March 31, 2020. Although the Debtors expect that the payments scheduled for March and September 2020 will be able to be paid before the end of 2020 (due to a single large customer receipt due in late 2020), it does not expect to be able to make future scheduled payments

as they come due.

## II.    <u>RELIEF SOUGHT IN THE DEBTORS' FIRST DAY MOTIONS</u>

32.    The Debtors have filed, or will shortly file, a number of First Day Motions related to the Debtors' business operations and to facilitate the efficient administration of these chapter 11 cases. I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief. A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below. For the reasons discussed below, I believe that the relief requested in the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases.

### A.    Joint Administration Motion

33.    The Debtors seek entry of an order authorizing their chapter 11 cases to be jointly administered for procedural purposes only. As set forth above, the Debtors are affiliated with each other. I believe joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders, and other papers and related notices that otherwise would need to be filed in both of the cases absent joint administration. Accordingly, I believe joint administration will save considerable time and expense for the court, the Debtors' creditors and parties-in-interest.

### B.    Motion to File Consolidated List of Creditors

34.    The Debtors seek entry of any order: (i) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, (ii) authorizing the Debtors to redact certain personal identification information for individual creditors, and (iii) granting related relief. I believe that permitting the Debtors to maintain a single consolidated list of  creditors, in lieu of filing a separate creditor matrix for each Debtor, is

warranted. Under the  circumstances, reformatting the creditor list, preparing and filing separate formatted creditor  matrices, and otherwise complying with the list-filing requirements will unnecessarily burden  the Debtors without any corresponding benefit to the estates.

**C.    Motion Extending Time to File Schedules and Statements and File Consolidated MORs**

35.    The Debtors seek entry of an order granting: (i) a 14-day extension of time to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") beyond the deadline prescribed by Bankruptcy Rule 1007(c) and; (ii) permission to file the monthly operating reports (each, an "**MOR**") required by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the Executive Office of United States Trustees (rev. 11/27/13) (the "**U.S. Trustee Guidelines**") by consolidating the information required for each Debtor in one report that tracks and breaks out all the specific information (e.g., receipts, disbursements, etc.) on a debtor-by- debtor basis. I believe that cause exists to extend the deadline to file the Debtors' Schedules and Statements given the limited Debtor personnel available to collect the information, the competing demands upon such personnel, and the time and attention the Debtors must devote to the chapter 11 cases and restructuring process. The requested extension will enhance the accuracy of the Schedules and Statements when filed, and help avoid the potential necessity of substantial subsequent amendments, without prejudicing any party-in-interest.

36.    Furthermore, I believe that consolidating the information required by the U.S. Trustee Guidelines for each Debtor in one report will promote efficiency in these chapter 11 cases without prejudicing any party-in-interest, as the MORs would accurately reflect the Debtors' business operations and financial affairs.

-14-

### D.   Case Management Motion

37.    The Debtors seek entry of an order approving certain notice, case management, and administrative procedures (the "**Case Management Procedures**"). I believe the Case Management Procedures will facilitate service of notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents, and other documents filed in these chapter 11 cases (collectively, the "**Court Filings**") that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases, while at the same time ensuring that appropriate notice is provided, particularly to parties who have expressed an interest in these cases and those directly affected by a request for relief.

### E.   Application to Retain Stretto as Claims and Noticing Agent

38.    The Debtors seek entry of an order authorizing their retention of Stretto as claims and noticing agent in  the chapter 11 cases. The Debtors and their proposed counsel have reviewed at least three (3) proposals from other court-approved claims and noticing agents to ensure a competitive process. I believe that Stretto's retention is the most effective and efficient  method of noticing creditors and parties-in-interest of the filing of the chapter 11 cases,   as well as other developments in the chapter 11 cases. Stretto will transmit, receive,  docket, and maintain proofs of claim filed in connection with the chapter 11 cases, which I believe is both necessary and in the best interest of both the Debtors' estates and their creditors. Accordingly,   I believe that retention of Stretto, an independent third party with significant experience in this role, to act as an agent of this Court, is in the best interests of the Debtors, their estates  and their creditors.

### F.   Cash Collateral

39.    The Debtors seek entry of interim and final orders pursuant to 11 U.S.C. §§ 105,

361 and 363: (i) approving the Debtors' use of cash collateral, as such term is defined in the Bankruptcy Code ("**Cash Collateral**"), (ii) providing adequate protection to Natixis (the "**Facilities Agent**"); and (iii) setting a final hearing pursuant to Fed. R. Bankr. P. 4001.

40.    As detailed above, the Debtors are obligors under the A&R Facilities Agreement pursuant to which the Prepetition Secured Debt is owing. Pursuant to the Offshore Security Agreement, the Debtors have pledged and granted a security interest in substantially all of their assets for the benefit of the Facilities Agent on behalf of itself and the other lender parties thereto. Accordingly, immediate access to Cash Collateral is necessary for the continued smooth operation of the Debtors' business, payment of the management fee in accordance with the MSA, and satisfaction of administrative expenses incurred in connection with the commencement of these chapter 11 cases.

41.    The Debtors propose to provide the Facilities Agent adequate protection, to the extent of the aggregate diminution in value of the Cash Collateral, by providing: (i) postpetition replacement liens on the accounts receivable of the Debtors, including cash generated or received by the Debtors subsequent to the Petition Date, (ii) to the extent the replacement liens are insufficient, superpriority claims over all other claims, and (iii) by making monthly adequate assurance payments to the Facilities Agent. In so doing, I understand that the Debtors satisfy the requirements of section 363(e) of the Bankruptcy Code to use Cash Collateral and ensure that the value of said collateral is preserved for the duration of the proceedings.

42.    The continuation of the Debtors' operations presents the best opportunity for the secured lenders party to the A&R Facilities Agreement to receive the greatest recovery on account of their claims. To this end, the Debtors' ability to make use of cash collateral is necessary in order for Debtors to meet their day-to-day operational needs. Accordingly, immediate access to the cash

collateral is of the utmost importance, and ultimately, is critical in preserving the value of the estate for all parties-in-interest.

### G.    Cash Management

43.    Pursuant to sections 105(a) and 363(c) of the Bankruptcy Code, the Debtors seek entry of interim and final orders: (i) authorizing, but not directing, the Debtors to maintain their existing bank accounts and continue using their existing cash management system (the "**Cash Management System**"); (ii) modifying certain operating guidelines relating to bank accounts set forth in the U.S. Department of Justice, Office of the United States Trustee: Guidelines for Debtors-in-Possession (the "**U.S. Trustee Guidelines**"); (iii) authorizing, but not directing the payment of related prepetition obligations; (iv) authorizing, but not directing the Debtors to continue using existing checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "**Business Forms**"); (v) modifying certain requirements under section 345(b) of the Bankruptcy Code; and (vi) authorizing, but not directing, the continuation of various transactions relating to certain shared management, general, administrative, and/or other similar shared services between the Debtors (the "**Intercompany Transactions**"); and (vii) authorizing and providing for administrative-expense-priority status to all claims arising postpetition in the ordinary course of business as a result of an Intercompany Transaction (such postpetition claims, the "**Intercompany Claims**").

44.    The Cash Management System is comprised of seven (7) deposit accounts utilized by the Debtors and are maintained at Deutsche Bank Trust Company Americas ("**Deutsche**") and JP Morgan Chase Bank, N.A. ("**JP Morgan**"), of which: (i) two are operating accounts, (ii) two are revenue accounts and (iii) three are accounts maintained in connection with the Debtors' loan obligations, two of which are restricted accounts (the "**Bank Accounts**"). The Cash Management

System is governed by that certain Master Accounts Agreement, by and between Debtor Seabras Bermuda, as Borrower, Debtor Seabras USA and the Brazilian Subsidiaries, as Obligors, TMF Brasil Administração e Gestão de Ativos Ltda., as Onshore Account Bank and Onshore Security Agent, and Natixis, as agent under the A&R Facilities Agreement (the "**MAA**").

45.    In the ordinary course of business, the Company utilizes the centralized Cash Management System to allow for the collection, pooling, and transfer of funds generated by the Company's operations, which are then subsequently disbursed to meet the Company's operating needs and loan obligations. The flow of funds between the Bank Accounts is such that the Company's customer receipts are deposited into a revenue account held by Debtor Seabras USA (the "**Seabras USA Revenue Account**"). Generally speaking, customer receipts are the only source of cash that is generated from outside the Cash Management System. Pursuant to the MAA, funds held in the operating accounts cannot exceed a certain amount. Therefore, the operating accounts generally will only contain the anticipated amount necessary to pay operating expenses. After the appropriate amounts are allocated for payment of operating expenses, the excess amounts are transferred into a revenue account held by Debtor Seabras Bermuda (the "**Seabras Bermuda Revenue Account**"). The Seabras Bermuda Revenue Account does not directly receive any customer receipts, rather it is a repository from which loan-related interest payments and management fees are paid. Moreover, when monetary needs present themselves, funds flow from out of the Seabras Bermuda Revenue Account and into the entity that requires the resources.

46.    The Cash Management system is an ordinary course, customary, and essential business system which allows for the smooth flow of cash between the Debtors' Bank Accounts and non-Debtor affiliates. Any interruption in the Debtors' ability to make use of this centralized system, or to engage in Intercompany Transactions would result in a disruption of the Debtors'

business, ultimately damaging the Debtors' estates.

### III.    INFORMATION REQUIRED BY LOCAL RULE 1007

47.    In accordance with Local Rule 1007-2, the information below, and the schedules attached hereto, provide certain information related to the Debtors.[3]

48.    Pursuant to Local Rule 1007-2(a)(3), to the best of my knowledge and belief, no official committee or ad hoc group of creditors was organized prior to the Petition Date.

49.    Pursuant to Local Rule 1007-2(a)(4), the Debtors' petitions contain a list of holders of the Debtors' twenty (20) largest unsecured claims on a consolidated basis, excluding claims of insiders.

50.    Pursuant to Local Rule 1007-2(a)(5), Schedule 1 hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

51.    Pursuant to Local Rule 1007-2(a)(6), I believe that as of end September 2019, the Debtors' unaudited consolidated financial statements, as prepared in accordance with U.S. generally accepted accounting principles ("**GAAP**"), aggregated $394,659,192 in total assets and $394,659,192 in total liabilities and equity.

52.    Pursuant to Local Rule 1007-2(a)(7), I submit that there are no publicly traded or held shares of the Debtors and the Debtors' directors and officers do not hold any classes of shares, stock, debentures or other securities of the Debtors.

53.    Pursuant to Local Rule 1007-2(a)(8), I submit that, as described herein, substantially all of the Debtors' assets are encumbered in favor of Natixis, as agent for the lender

---

[3] The information contained in the Schedules to this Declaration shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

parties under the A&R Facilities Agreement. Moreover, certain property of the Debtors may be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, secured creditors, or agents. Providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property is unnecessary under the circumstances and would be impractical.

54.    Pursuant to Local Rule 1007-2(a)(9), Schedule 2 hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

55.    Pursuant to Local Rule 1007-2(a)(10), Schedule 3 hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

56.    Pursuant to Local Rule 1007-2(a)(11), I believe that there are no actions or proceedings, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

57.    Pursuant to Local Rule 1007-2(a)(12), Schedule 4 hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

58.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), I submit that the Debtors do not have any employees. Rather, as provided above, the Debtors' operational services are provided by Seaborn Manager pursuant to the MSA. Moreover, the Debtors do not anticipate paying any officers, stockholders, directors or consultants for the 30-day period following the Petition Date other than $15,000-$20,000 in connection with business consulting services.

59.     Pursuant to Local Rule 1007-2(b)(3), Schedule 5 hereto provides, for the thirty

(30) day period following the filing of the chapter 11 cases, a list of estimated cash receipts and

disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain

unpaid, other than professional fees.

## IV.    CONCLUSION

60.     This declaration illustrates background information about the Debtors, their

business operations, and circumstances surrounding the commencement of these chapter 11 cases.

*[Signature Page Follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 22nd day of December, 2019.

/s/ Roger Kuebel

Roger Kuebel
Chief Financial Officer of the Company

## Exhibit A

**Organizational Chart**

[See attached]



*MSA - Management Services Agreement under which Seaborn Manager manages the Company.
** Chapter 11 Debtor.

## SCHEDULE 1

### Consolidated List of the Holders of the Debtors' Five Largest Secured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

| Creditor Name | Creditor Contact | Amount of Claim | Collateral Description and Value |
|---|---|---|---|
| Natixis, as agent for the lender parties under the A&R Facilities Agreement. | 1251 Avenue of the Americas New York, NY 10020 Attn: Valérie Du Mars, Director /Antony Perna, Director<br><br>68-76 Quai de la Rapée 75012 Paris, France Attn: Jean-Louis Viala, Executive Director | $149,149,360 | Substantially all assets of the Debtors subject to certain Excluded Assets (as defined in the A&R Facilities Agreement). |

## <u>SCHEDULE 2</u>

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their  businesses as of the Petition Date.

| Property Address | City, State, Zip code | Country | Owned or Leased |
|---|---|---|---|
| 60 Hudson Street | New York, NY 10013 | USA | Leased |
| 111 8th Avenue | New York, NY 10011 | USA | Leased |
| 14 Self Boulevard | Carteret, NJ 07094 | USA | Leased |
| 800 Secaucus Road | Secaucus, NJ 07094 | USA | Leased |
| 1400 Federal Boulevard | Carteret, NJ 07008 | USA | Leased |
| 125 Belmont Drive | Somerset, NJ 08873 | USA | Leased |
| 165 Halsey Street Telecom & Data Center Building | Newark, NJ 07102 | USA | Leased |
| 2 Emerson Lane | Secaucus, NJ 07094 | USA | Leased |
| 1400 Wall Church Street | Wall Township, NJ 07719 | USA | Leased |

## <u>SCHEDULE 3</u>

### Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location  of Debtors' Assets Outside the United States

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of  the Debtors' substantial assets, books and records, and the nature, location, and value of any  assets held by the Debtors outside the territorial limits of the United States as of the Petition  Date.

### Location of Debtors' Substantial
### Assets

The Debtors' primary asset is the U.S. and international portion of Seabras-1, as described above.

### Location of the Books and Records

600 Cummings Center, Suite 268Z, Beverly, MA, USA.

### Debtors' Assets Outside the United States

As described above, portions of Seabras-1 are located outside of the United States.

## **SCHEDULE 4**

### **The Debtors' Senior Management**

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name/Position | Relevant Experience/ Responsibility | Tenure |
|---|---|---|
| Larry Schwartz<br><br>Chairman and Chief Executive Officer | Larry is the Chairman & Chief Executive Officer of Seaborn Manager. Larry is also CEO of each of the Debtors. He has led Seaborn Manager from startup through its ECA-backed project financing of Seabras-1 and is responsible for leading the company's growth. Larry previously served as CEO, board member and one of the owners of the parent company of Global Marine Systems Ltd., one of the world's largest fleets of cable ships and a leading installer of submarine fiber optic cable systems. Larry led the acquisition of Global Marine from Global Crossing in 2004 as well as its subsequent restructuring through a company voluntary arrangement under UK insolvency laws and then the asset acquisition of Red Sky Systems, a developer of subsea network technology. He also previously served as a board member of International Cableship Pte Ltd, a JV with Singapore Telecom that provides subsea cable maintenance in South East Asia.<br><br>Before entering the cable ship business, Larry served as a Senior Vice President of Genuity Inc., a Fortune 1000 and Nasdaq-listed, wholesale carrier with a global network infrastructure, and he also served as Co-Head of Genuity's Office of Technology & Corporate Development. While there, he led the consolidation of Genuity's Tier I Global IP Infrastructure with and into Level 3 Communications via a pre-packaged chapter 11. Prior to Genuity, Larry was an equity partner with Choate Hall & Stewart, where he specialized in international communications & media transactions. He began his career with White & Case, where he worked on international project finance transactions, cross-border restructurings, large-scale privatizations and M&A. | Nov. 2010–Present |
| Andy Bax<br><br>Chief Operating Officer | Andy is Chief Operating Officer of Seaborn Manager and of the Debtors . He is responsible for leading all aspects of Seaborn Manager's global operations and engineering. Over the past three decades, Andy has developed and brought into operation numerous transoceanic and regional submarine cable systems connecting Africa, the Americas, Asia, Australia, Europe and the Middle East.<br><br>Andy previously served as Head of Regional Submarine Networks at Global Marine Systems, a preeminent subsea cable installation company. Prior to Global Marine, Andy was an early | Nov. 2010–Present |

| Name/Position | Relevant Experience/ Responsibility | Tenure |
|---|---|---|
| | member of Global Crossing's Network Team, where he brought into service all of Global Crossing's submarine networks, and he led engineering and implementation of network upgrades and provisioning of customer circuits on the global submarine network.<br><br>Andy began his submarine telecom career with FLAG (FEA Submarine System), where he was responsible for the successful commissioning and bringing into service of all 15 segments of the Europe to Asia submarine system and for the centralized management of the entire system from the FNOC in Fujairah, UAE.<br><br>Prior to Seaborn Manager, Andy led the project management for a new 1,240 km submarine fiber optic cable system linking Trinidad, Guyana and Suriname.<br><br>Andy served in the Royal Air Force where he received a degree in Electronic Engineering and Aerospace Studies, and thereafter entered the telecom industry with NYNEX in the UK.. | |
| Roger Kuebel<br><br>Chief Financial Officer | Roger is Chief Financial Officer of Seaborn Manager and of the Debtors. He is responsible for managing all financial operations as well as treasury and tax. Roger has previously worked extensively in the wholesale carrier industry with other members of Seaborn's management team when he was at Global Crossing and Genuity.<br><br>Roger has served as Vice President and Treasurer for public telecom and technology companies for the past 11 years. The majority of his 20 plus year career has been in the telecom sector, including senior finance positions at Global Crossing, Genuity and GTE. He has led or played a key role in equity and debt IPOs, telecommunications restructurings, and has extensive experience in all aspects of financing, both in the bank and capital markets. In addition to expertise in financing, Roger has significant experience in operations analysis, financial planning, tax planning, transfer pricing, insurance, management of receivables and payables, mergers & acquisitions, financial systems and processes, and reporting, both internally and externally.<br><br>Roger most recently served as Vice President & Treasurer of Aspen Technology, Inc. (Nasdaq: AZPN). He began his career in manufacturing at a division of General Motors and spent four years after graduate school at the consulting firm of Stern, Stewart & Co. during that firm's pioneering work on the concept of Economic Value Added.<br><br>Roger has an M.B.A. from the University of Chicago, with a specialization in finance, and a B.S. from Penn State, majoring in Operations Management. | Feb. 2014–Present |

| Name/Position | Relevant Experience/ Responsibility | Tenure |
|---|---|---|
| Paul Cannon<br><br>Vice President, Engineering and Operations | Paul is Vice President, Engineering & Operations of Seaborn Manager. Paul previously served as Vice President of Planning and Design for Global Marine Systems as part of their joint venture business, Huawei Marine Networks where he was based in Tianjin, PR China for 6 years.<br><br>Prior to Huawei Marine, Paul led the solution design team at Global Marine Systems in the UK securing their first turnkey system installation project, and later Huawei Marines first repeatered project.<br><br>Paul began his submarine telecom career with Global Crossing as a Network Specialist on their Pan European network where he subsequently led the Network Operations team. Paul became responsible for Global Crossing's Pacific Crossing 1 cable system and later became Global Implementation Manager, merging both the marine and terrestrial project teams as they planned, coordinated and executed in excess of 60 new build and upgrade projects during a period of 12 months.<br><br>Paul studied Electrical Engineering and began his career in telecoms with British Telecom plc. before moving to Tele-west UK. | Sept. 2014–Present |
| Patrick Hill<br><br>General Counsel and Corporate Secretary | Patrick is the General Counsel and Corporate Secretary of Seaborn Manager. He is also Corporate Secretary for the Debtors. He is responsible for negotiating the company's corporate transactional agreements and commercial agreements, as well as managing dispute resolutions with third parties. He plays a lead role in all aspects of the company's legal affairs, including shareholder and board matters, intellectual property and regulatory matters.<br><br>Prior to joining Seaborn in June 2016, Patrick was in-house counsel at Boston Beer Corporation, where he focused on matters relating to capital acquisition, real estate, procurement, employment law, and leading contract negotiations with key suppliers, all during a period in which Boston Beer achieved historic year-over-year growth.<br><br>Patrick received a Juris Doctorate from Northeastern University and a Bachelor's Degree in Economics & Political Science from Saint Michael's College, where he graduated with honors. | June 2016–Present |

## SCHEDULE 5

**Debtors' Estimated Cash Receipts and Disbursements for the
Thirty-Day Period Following the Filing of the Chapter 11
Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| Estimated Operating Cash Receipts | $1.1 million |
| Estimated Cash Disbursements | $4.5 million |
| Estimated Net Cash Loss | ($3.4) million |
| Estimated Obligations Expected to Accrue | $3-5 million |
| Estimated Uncollected Receivables | $1.9 million |